All right, we'll call the next case, Cadena v. Ray. Mr. Deaves? May it please the Court, I'm Chris Deaves. I represent Dean Cadena. The disputes here do not rely upon the standards of review or the causes of action that are at issue. What really is the dispute here is what people have perceived from the videotapes by Mr. Cadena's cell phone, as well as from the Hotel Valencia. And we believe that given that this case is of a fact-intensive analysis, it was inappropriate for the trial court to grant summary judgment and dismiss the claims. What we're bringing here today is an excessive first case, which has a three-prong analysis. The first issue is whether an injury occurred. And there's no dispute that Mr. Cadena suffered a cut above his eye and taser marks and has anxiety these days as a result of what occurred on the night at the Valencia Hotel. The second issue is whether it resulted directly and only from the use of force that it was excessive to the need. And we believe that there's at least a fact question here as to whether the use of force was excessive. Given the short amount of time, which I will discuss later, between the time that there was the confrontation. Is that a fact question about whether forcefully? If we all agree on the facts, there's no disputed issue of fact. Right. Is the conclusion of whether those undisputed facts amounts to excessive force a legal question or a jury question? The excessive force would be a jury question. Why? Because that's the constitutional standard. I mean, you violate someone's constitutional rights under the Fourth Amendment if you use excessive force. Why isn't that a legal question? Well, that would be. I apologize. Yes, Your Honor. That would be whether it meets the legal standard. So here, what are the disputed issues of fact? Because all of this was caught on camera. Well, the disputed issues of fact are whether. It looks like it either is or it ain't a violation of the Fourth Amendment. Well, the question is given how the timing at issue, these courts have looked at the question of the timing between the conflict between the officer or the time the officer came into question with Mr. Cadena to the time that he was put on the ground would be. He was put on the ground pretty quickly. Very quickly. Over very quickly. So it seems to me the question is you almost have to argue they didn't have the right to take him down. Well, that would be our argument that there was no need to take him down because there was only a few seconds. I mean, if you can hear on the video him tell to put his hands behind the back, which I've listened to video more than I've wanted to, I don't see any audible announcement of that. But even if you perceive it's true, the next issue is he says, no, sir, I'm not. No, I'm not. No, I'm not. And it's not a confrontational tone. He just said, I'm not doing what you're saying I'm doing. But he's still not complying with the officer's request to stand still and put his hands behind his back. Well, he didn't really have time to stand still and put his hands behind his back because when you take the time in the video, it's less than 10 seconds between the time he even has the officer talk to him and the time that he's pinned on the ground. The motion where he goes towards the wall of the hotel. But I don't I don't perceive any way that that's pulling away. It looks much more like he's been pushed in that direction. And then by the time he's pulled and shoved and moved to the ground, four seconds later. At what point does he say, no, no, no, I'm not going to do that. It's on the cell phone. But at what point is that when he's against the wall? It's unfortunately when he's behind the post. There's a there's if if everything worked out right, there would not have the video would have been continuous. But there was between the behind the cell phone video and when he's pushed back. And then, unfortunately, he's behind the post when the actual the directions are given to him. He then emerges from the post with a perception from the officers that he's pulling away. But even if that's considered a factor, when you look at the standards for objective reasonableness, it was not a severe crime. But the most crime that could be here is public intoxication or interfering. Those are both missed. And they seem to talk to him extensively. He just was he would not get he would not get away. He said, Lee, sir, I want you to go outside. And he kept engaging the officer. I'm going to, you know, just back and forth, back and forth. That was about a minute to three minutes of conversation. That's quite a long conversation in these circumstances. And he said, we've sent already sent a wagon or whatever it is for your life. You need to leave the premises and step outside. And he stood his ground and kept talking back to the officer, basically. And then you can't. The officer says something. It does sound like he said, no, I'm not doing that. He's continuing to argue with the officer. He's not compliant. Well, he when he's talking to the officer, the officer is immediately confrontational with him. If you recall the video beginning, he says, I have the right to videotape this. And the officer says, you know, I have the right to arrest. He had done acts that were diffusing the situation. He's telling you not required to be nice. You know, this constitution does not require that. I understand. But I'm trying to putting him in his shoes where he's dealing with a police officer. He's supposed to do what the officers say. And he was beginning to leave and then turn. There's no dispute. He was beginning to leave. He says he felt he was pushed and then turned the corner back. But he was beginning to leave, you know, the situation. What in this situation? I mean, he says he was not overly intoxicated, whatever that meant. I think finally said I'm not intoxicated. But anyway, he was leaving and then he decides to turn around and go back behind the post. What precipitated that? Well, he felt like he felt like he got a push in the back. That's what his affidavit or declaration says. Well, no, no. I mean, when he didn't come down, didn't go back around the post. And then it's when they got knocked up against the wall. Yes, Your Honor. He goes this way and then around the post. Yeah, but he clearly wasn't being pushed when he was going back around the post. No, he's coming back around the post and then he emerges. It looked like he was coming out and then he decided to go back around the post. Yes, Your Honor. That's exactly. He came behind and decided to go back around the post. He felt like something had happened to him. He says it was a push in the back. But he felt like something. There's no evidence of that. Well, that was his perception. Oh, you mean he got pushed in the back before he came out to go around? Right. He feels like he was pushed in the back and that's why he circled. But he wasn't being pushed around to go back. He began to go this out of the door. He felt like he got pushed. And when he felt like he got pushed, then he walked back around the post to see who pushed him. That's my client's declaration statement of what. When he was supposed to be going out of the building. He'd been instructed to leave the building. He wasn't asked to step out of the situation because his wife was being arrested, yes. His brother-in-law got into it. They had a whole melee there. Well, there were some things going on at the hotel for the last guy to grieve. Just from an objective standpoint from the officer's viewpoint. I mean, as Judge Sholley said, it happened pretty quickly when the brother-in-law was taken down. Right, yes. From an objective standpoint, the police officer, it's hard to see why they didn't have the right to take him down. Why they didn't have to? Why they had the right to take him down. Yeah, he barely had a second to comply before the cell phone video flies out of his hands. He's emerged from the post. He's at most committed to misdemeanors at that post. And they take him down very quickly. Now, I've timed out the video. He was four seconds between when he emerges from the post and is against the wall, two seconds before they grabbed him by the head and the neck, four seconds he's slammed on the ground, and then for the next seven seconds he's pinned on the ground by the two officers. Officer Morota then enters, tazes him once or twice. He lays there limp for six or seven seconds. He's rolled over. The perception is he was wrestling or fighting. I've watched the video. I don't see that. He's in motionless, and then he's for about a minute, and then he gets a knee to his neck and then a knee with full force to his whole body. What was he doing at the time they tazed him? What does the film or the video show? He was down on the ground at the time. But was he kicking or anything like that? I thought his right arm was reaching out. His right arm may have been. He was basically on the ground. I've never seen him move his right arm up or down. At some point his right arm was reaching up and back. Well, that's when they pull his arm around him. At one point they do pull his arm back to try and put his arm behind his back to get him handcuffed, but he's not making those types of motions. He's pinned to the ground. I thought he was resisting. Resisting? I don't see any wrestling or… He was not struggling when he was on the ground. When the police first threw him onto the ground, he didn't struggle after that. I don't perceive him to be struggling at that point, or at least the perception of that would be let a jury take a look at it to determine whether he's struggling or wrestling. It's not a clear, defined moment where he's up flailing or punching or kicking. There's a recent case out of this court called Trammell, which discusses that the timing and the speed with which an officer reverts to using force is determinative of the question of whether it's excessive. In that case, which is 868F332 and was decided back in August, the court talks about that there was a two-second timing before the force was used. Only three seconds passed between the initial request that he push his hands behind his back and when the officers tackled Mr. Trammell, a reasonable jury could infer that the officers used very little, if any, negotiation before resorting to violence and the officers' conduct did not meet the measures and ascending actions calibrated to Trammell's conduct. What started all of this? I mean, his wife, she was on the floor intoxicated, is that correct? His wife was intoxicated. It's alleged she urinated in the lobby of the hotel. It was barefooted in the corner. Yeah, but he is there. When did the police get into it? I think the police were there. At the time the video starts, the police had already arrived about, I don't know if they arrived because it was a bachelorette party or because they were just in the neighborhood. There were a lot of bike patrol officers in that vicinity. So anyway, so they came in. What got him involved in it? He had been upstairs and then came down. His wife came down the hotel to the lobby first. He had been upstairs at the bar restaurant on the second floor of the hotel. He came down to the lobby area, saw his wife over in the corner being arrested, and then decided to videotape her arrest on his cell phone. So we think that given the immediate nature of this. Wasn't the brother-in-law taken down right before he was? The brother-in-law, I don't remember exactly what goes first and second, but I think the brother-in-law, I think it's later, but it's very close to the same time the brother-in-law was taken down as well. But there was a situation, clearly. The brother-in-law, who I don't represent, said he was definitely a little more agitated and causing a scene much more than my client. So we're not talking about the brother-in-law. Well, but I'm just saying that you've got to look at the totality of the circumstances from an objective police officer standpoint. And they're engaging with the brother-in-law. Your client has been told to leave. He turns back around and is looking towards, look to me like on the video, what's happening to the brother-in-law, and it looks like they're both taken down. Look, I think the brother-in-law is towards this side of the lobby. But within eyeshot of your client. If you come into the hotel lobby, you could see both people. I mean, the video covers the whole lobby area. So you see this happening. The brother-in-law you can see on the video at the same time. This is happening to your client in very close proximity. And the takedowns are, if not at the same time, very close to the same time. Yes, I agree. It's not just like we're dealing with your client in isolation. There's a family situation here. But I think the officers need to judge the situation, each officer, because Rodriguez is over on this side of the lobby. The brother-in-law is over on the other side of the lobby. But your client looks like he's turning towards what's going on with the brother-in-law as if to get involved in that melee. He's turning towards his wife. His brother-in-law is more to the back left of the situation that's going on. Coming back to the situation instead of leaving the building. He felt something had happened to him. But I'm just saying from an objective police officer standpoint, he turned to come back toward a situation which included an altercation with his brother-in-law over here. But the officer needs to look at what's going on because Rodriguez is facing him behind the post. It's not that Rodriguez is over with the other client. I'm just saying, looking at the totality of the circumstances, there was quite a bit. He started hollering, no, no, George. Is that on the tape, on the video? No, no, don't do it, George, or something like that. Is he talking to his brother-in-law? I think so. All right. Mr. Deas, I believe we've got your opening argument. You've saved some of our time. We're going to hear from the Senator. Mr. Leibovich. May it please the court opposing counsel, Mark Cassano, which on behalf of the appellees and the officers, Craig Rodriguez, Christopher Ray, and Michael Morota, the trial court did not commit error when it dismissed this cause of action at the summary judgment stage. We had three officers that were dealing with an intoxicated Mr. Cadena on the night these events evolved. They were also dealing with his intoxicated wife, who was actually in the corner of the hotel lobby. Mr. Cadena initially was involved in a conversation with a non-defendant. That was Officer Garcia. And Officer Garcia, he clearly told him to leave. And Mr. Cadena actually admitted that he was intoxicated. Importantly, and you can kind of use this as I'm going to point here in the courtroom, Officer Rodriguez was actually standing over in this area while Officer Garcia was over in this area talking with Mr. Cadena. And Mr. Cadena says, I'm going to leave. And he has a cell phone and a cell phone at the same time. And you can actually see, if you time up the two videos, you can actually see Mr. Cadena say, I'm going to leave. He's intoxicated. He's interfering. And Officer Garcia had told him he was interfering but gave him the opportunity to leave the premises. You see Mr. Cadena leave and act as if he is going to leave. And then he doubles back around the pillar. And there's a moment on that videotape when you can actually see Officer Rodriguez's vision catch Mr. Cadena from around the pillar. And it's very important because we've heard, and it's in their briefing, and I believe Mr. Deaves has discussed it this morning, about the reasons as to why Mr. Cadena came back to the scene. And I think the trial court correctly addressed this issue. That's completely immaterial because the use of force, with the totality of the circumstances, is viewed from the objective position and from the perspective of the officer as he sees the events unfolding. It's not what Mr. Cadena's intention was or what he believed. Officer Rodriguez, as soon as he comes around that pillar, he says, and it's uncontroverted and it's in his affidavit, he says immediately, put your hands behind your back. Put your hands behind your back. Now, admittedly, the second time he says it, I believe that the video that captured that, the last portion of that sentence, is cut off. And Mr. Cadena's immediate response is, no, I'm not, no, I'm not, no, I'm not. That's not what I heard on the video, but go ahead. He then pulls his arm back. If you watch the videotape, he pulls his arm back a little bit and takes a step back, and that's when they go across the floor of the hotel, and that's how they end up against the wall, and that's when he goes to take him to the ground. And that's when Officer Ray sees that he's resisting arrest and comes over to assist, and they put him down on the ground as quickly as they possibly can, and that's when he starts to fight them on the ground. Officer Ray actually stands up because another officer, I believe his name is Officer Martinez, actually comes over and starts to assist, and then Officer Rudiman actually comes in and tries to contain the situation as well because Mr. Cadena is not relinquishing his arms being placed in handcuffs. Officer Ray actually does then reengage at another point in time because he continues to struggle, and then you see Officer Morota come in to the hotel lobby. From Officer Morota's perspective, he's actually walking up to the hotel lobby. He actually sees through the door, which was open, that there's a struggle going on, and at one point in time, you actually see Mr. Cadena's arm actually come forward of his body. He's resisting arrest. Officer Cadena walks in the door and immediately sees what's going on, pulls out his taser, and yells, Taser, taser, taser, three times, and he tases him. They actually get back on top of him because he still does not want to comply, and once they're actually on top of him again and actually do have him handcuffed, Mr. Cadena actually tries to raise up again while he's on the ground, and that's when you see Officer Rodriguez go back up and put his knee initially towards his neck area, and then he positions it back between his shoulder blades. His concern, and it's uncontroverted in his testimony and his affidavit, was I was concerned that he was, A, either going to try to get back up off the ground or else he was going to roll over and kick Officer Rudiman, who was standing right there, or who was actually trying to—actually, at that point in time, Officer Rudiman was actually trying to do a pat search and to find out what he had in his pockets, and after the arrest, they did find marijuana on Mr. Cadena. Those actions, we believe, on top, when you look at the totality of the circumstances in the video, showed that the force that they used was not excessive, and that's what the trial court's conclusion was, that the totality of the circumstances that they were confronted with, the force that they used to contain the situation as quickly as possible was reasonable. In light of the fact that, and I believe there was a question earlier as to the brother-in-law, I think that was what the relationship was, it was when Mr. Cadena was actually on the ground that Officer Ray actually then went over and assisted with subduing the brother-in-law because he actually tried to interfere. It appears that he tried to interfere in the arrest of Mr. Cadena. So in total, they had three individuals that they placed under arrest that evening. We don't believe that there's a material issue of fact. The evidence on the videotape conclusively shows that the force that they used to contain the situation and place Mr. Cadena under arrest that day was reasonable at every step of the videotape as you watch it. What about the injury that he alleges? We don't know where he, I believe he says he received a cut on his head. We don't know where that occurred. Was a picture taken of him when he was arrested and put in the detox? Tell me what happened to him after this event. Was he taken then to the police station? He was actually taken outside. That's where they did another search of him. They patted him down. They found the marijuana. They put he and his wife and the brother-in-law. I don't think they put them all in the same vans. They were all taken downtown, and they were booked into the magistrate, into the city's booking facility, the detention center in San Antonio. So they spent the night in jail? Yes, Your Honor. Whatever the time was, they did spend time in jail, and then they were released. And at one time they spoke of taking the plaintiff here to the detox unit, but that was before they found the marijuana on him. I'm sorry, Your Honor? I thought there was some talk about taking him to the detox. They would take him to the detox unit, which I assume was something different from a jail cell. I don't know if the facility, I think they take them all to the, I'm not. Okay, it's irrelevant. They found the marijuana on him. The female officer that was driving the paddy wagon that night took him out and did the search, and that's when she did the second search on him because she's responsible for the prisoners that she transports. She found the marijuana on him. Officer Rudeman was trying to do the search when he was laying on the ground. You can see that. That's towards the end of the incident. But then when he was taken outside, that's when there was a second search. For the reasons that I've articulated, we believe that the trial court's judgment should be affirmed. All right. Thank you, sir. Any rebuttal, Mr. Deese? Yes. Your Honors, even if there was a situation that the reasonable officer had to arrest Mr. Cadena for either public intoxication or interference with a public servant, this was not the way to do it. Mr. Cadena came around, and at most, they said, in two seconds, put your hands behind your back. He had little time to comply. He had no time to resist. He was immediately put on the ground, and, you know, five, six seconds passed. Okay, you say you timed all of this. What was the timing from the beginning of the confrontation of your client with police and the time that he was thrown on the ground? The total time, the video time, between when he initially had discussions with the police officers to the time he moved behind the post was about three minutes. From the time he came around the post until he came to the wall and was pinned was about six to seven seconds. So he had no time. Even if he said, no, no, no, we don't step up immediately in that situation to pinning somebody on the ground. He had no sir, no sir, no sir. Now, in the meantime, his brother-in-law had come into the scene. His brother-in-law was over on the other side. Yeah, but he came into the scene. Like, did he come down from the lobby or down from the restaurant? I mean, he came out from somewhere. I think he came out from the front door of the hotel, if I remember correctly. And he came in, and is that when I thought your client began to say something like, no, don't do it, George, trying to cool him. Like, he was getting, like, is it George? Is that his brother-in-law's name? I'd have to confirm. But, at any rate, he's getting ready to get into some real action himself with the police, and your client was trying to dissuade him from doing that. My client, throughout the process, was trying to dissuade people from doing things. I mean, he told his wife to calm down, even though the police perceived that his mere presence there was causing her to become more agitated. Well, she was calling back out to him. Right. I couldn't tell whose voice that was on what I saw. He was saying, don't do it, don't do it, George, or whatever. That was your client's? Is it undisputed that was his voice? I'd have to confirm that. I could tell he was an officer telling another officer, don't do whatever. If it was anybody, I believe it was my client. But I can send a letter. I don't want to misrepresent it. That's not fine. To refresh my memory, what's the extent of the injury? He had a cut on his cheek. He has anxiety, and then he had two taser marks on his buttocks. Those were demonstrated in the photos attached to our response to the motion for summary judgment. Okay. And one thing is the marijuana was found after all of this occurred, and then he was taken in. But the marijuana issue is not an issue. It's an issue here that bears on what was going on at the time. And we've really focused and the whole appeal relates to the use of the excessive force in constituting the arrest. And I just think that it should go to a jury to see how it is perceived, how the arrest occurred, and that the trial court erred in granting the summary judgment. Thank you. And the standard is no reasonable officer would have thought this was reasonable? The standard is that a reasonable officer would not have done what officer— No reasonable officer would have done. No reasonable officer. Right. Okay. All right. Thank you. Thank you, Mr. Sandovich. The case will be submitted.